IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JULIO F. FEBUS-CRUZ, et al., <br><br> **Plaintiffs**, <br><br> v. <br><br> HERIBERTO SAURI-SANTIAGO, et al., <br><br> **Defendants**. | CIVIL NO. 09-1365 (FAB) |

**OPINION & ORDER**

BESOSA, District Judge.

On June 8, 2009 plaintiffs Julio F. Febus-Cruz ("Febus"), Ana H. Ortega-Matos, and the Febus-Ortega conjugal partnership filed an amended complaint against defendants Heriberto N. Sauri-Santiago ("Sauri"), Executive Director of Puerto Rico's Agencia Estatal Para el Manejo de Emergencias y Administracion de Desastres ("AEMEAD"), Salvador Collazo-Cartagena ("Collazo"), Orocovis Zone Director of AEMEAD, and Emanuel Cantres-Carmona ("Cantres"), AEMEAD's Director of Human Resources.  (Docket No. 28)  On July 23, 2009, the Court dismissed several claims, leaving Febus's political discrimination cause of action against Collazo in his individual capacity and against Sauri in his official capacity as the only federal claims.  (Docket No. 45)

Defendants Sauri and Collazo moved for summary judgment on the remaining claims on August 10, 2009.  (Docket No. 53)  Plaintiffs

Civil No. 09-1365 (FAB)                                              2

opposed this motion on August 18, 2009.  (Docket No. 59)  For the reasons provided below, the Court **DENIES** defendants' motion.

**I.   Background**

    **A.   Febus's first set of evaluations at AEMEAD**

Febus, a former regular career employee of the Municipality of Barranquitas, was appointed to the career position of Deputy Director of the Orocovis Zone of AEMEAD effective September 1, 2008.  The appointment was for a six-month probationary period.  Collazo, the Orocovis Zone Director of AEMEAD, was Febus's immediate supervisor. Administrative Order 93-002 of the State Civil Defense Agency provides instructions for evaluating probationary employees.  These instructions direct that Collazo, as Febus's immediate supervisor, should have evaluated Febus.  Nevertheless, Oscar Sotomayor-Vincent ("Sotomayor"), AEMEAD's Operations Director, whose work station was in AEMEAD's San Juan Central Office, carried out Collazo's first three evaluations for the periods between September 1 to September 30, 2008, October 1 to November 30, 2008 and December 1, 2008 to January 30, 2009.  The three evaluations were all positive.  The use of Sotomayor as an evaluator rather than Collazo was approved by the former Executive Director of AEMEAD, Carilyn Bonilla-Colon.  Cantres, AEMEAD's Director of Human Resources, testified in his deposition that the use of Sotomayor to evaluate Febus was not improper despite its apparent incongruity with Administrative Order

Civil No. 09-1365 (FAB)                                                    3

93-002.[1]  Notably, despite the fact that Sotomayor was reassigned to a regular career position as an Emergency Management Specialist with no supervisory duties as of December 16, 2008, he still provided an evaluation for the period that ran until January 31, 2009.  He never discussed this evaluation with Febus.

    **B.**    **Febus's second set of evaluations at AEMEAD**

On January 2, 2009, Luis Fortuño-Burset ("Fortuño"), a member of the New Progressive Party ("NPP"), became Governor of Puerto Rico, replacing Anibal Acevedo-Vila, a member of the Popular Democratic Party ("PDP").  Fortuño named Sauri as the Executive Director of AEMEAD on January 7, 2009.  Somewhere around this time, Evelyn Cumba-Santiago ("Cumba") was named as Director for Administration of AEMEAD.  According to a restructuring carried out by Sauri, Cumba was placed third in the chain of command at AEMEAD and was charged with overseeing the Human Resources Office, in addition to other AEMEAD units.  Cumba was in charge of Human Resources for only one to two months, and it was during this time

---

[1] Defendants dispute whether the applicable rules permitted AEMEAD to use Sotomayor to evaluate Febus.  They assert that Sotomayor could only step in to evaluate Febus, or anyone else in the Orocovis Zone for that matter, if Collazo was on vacation, which he was not during the time in question.  To contest whether it appeared improper that Sotomayor carried out Febus's evaluations, plaintiffs rely upon Cantres's negative response to the question of whether Collazo complained that Sotomayor carried out Febus's reviews. (Docket No. 60-4, pp. 51-52)  This citation does not help the plaintiffs because the question posed was whether Collazo complained at any time *prior to 2008*.  Collazo could not have complained prior to 2008 because Febus did not receive his probationary appointment until 2008.

Civil No. 09-1365 (FAB)                                                  4
_____

that AEMEAD carried out an additional evaluation of Febus that lead to Febus's eventual termination.

In February, 2009, Cantres brought Cumba evaluations for two "zone employees," Febus, who was from the Orocovis Zone, and another employee from the Humacao Zone.  Cumba testified that she noticed that the evaluations for the employee from the Humacao Zone were carried out by the director of that zone, whereas Febus's evaluations were done by Sotomayor.  Cumba said she thought it was strange that Febus's evaluations were done by Sotomayor; she also thought it was strange that Sotomayor's final evaluation of Febus had been done through January 31, 2009 when Sotomayor had been reassigned in mid-December of 2008 to a post in which he had no supervisory authority.  Cumba advised Sauri of these irregularities and he told her that the evaluations should be carried out by Febus's immediate supervisor, Collazo.  Cumba then directed Collazo to evaluate Febus, not only for his final evaluation but for the prior periods for which Sotomayor had already filled out evaluations.

Collazo met with Febus on February 18, 2009 to discuss his evaluations of Febus, in which he found Febus's performance to be subpar.[2]  Febus disagreed with Collazo's evaluations and he noted his disagreement in writing.  That same day, February 18,

---

[2] Collazo testified that one of Febus's shortcomings was that he failed to turn in weekly reports.

2009, Sauri issued a letter notifying Febus that he would be separated from his employment because he did not satisfactorily complete his probationary period.[3]  Febus received this letter on February 27, 2009.

### C. Evidence Relevant to the Evaluations Done by Sotomayor

During the time that he was the Director of Operations for AEMEAD, Sotomayor oversaw operations in AEMEAD's eleven zones (covering the entire island) and he was stationed in San Juan.  In the entire island, Sotomayor only evaluated one employee: Febus. For example, although another deputy director began work in the Aguadilla Zone while Sotomayor was the Director of Operations, he did not evaluate that deputy director.  Instead the deputy director of the Aguadilla Zone was evaluated by his immediate supervisor, the Zone Director.  Sotomayor only visited the Orocovis Zone one time during Febus's stay in that office, although Sotomayor and Febus met on occasion in San Juan where Febus gave Sotomayor oral reports on the work that he had done.

### D. Evidence Relevant to the Evaluations Done by Collazo

Although Cumba testified that she learned of Sotomayor's evaluations of Febus from Cantres when he provided her with the evaluations, Collazo also testified that he brought up the Febus

---

[3] Pursuant to Administrative Order 93-002: Probationary Period Standards, an employee's failure to perform at a certain level in one or more areas in which the employee is evaluated is a sufficient reason for separating that employee from his employment. (Docket No. 54-13, Ex. 12, p. 9-10)

situation with Cumba and asked that he be allowed to evaluate Febus.  (Docket No. 60-9, pp. 49-50)  Collazo made this request directly to Cumba, who was appointed by the new NPP administration, rather than to Cantres, the head of Human Resources, whom he believed to be a PDP sympathizer.  In February, 2009, Cumba relieved Cantres of his duties in regards to the personnel files of AEMEAD employees; she also excluded him from the evaluation and decision-making process regarding Febus.

Febus testified that he did not agree with the evaluations by Collazo, stating that Collazo made up the problems with his performance.  Febus and Collazo testified that Collazo had not given Febus any reprimand or memorandum detailing any negative performance by Febus prior to his negative review of February, 2009.  Cantres also testified that Febus's human resources personnel file does not reveal any reprimand by Collazo or by anyone else.  Lilliam Martinez-Santana ("Martinez"), Collazo's secretary, testified that Febus did all of the work that Collazo assigned to him.  (She also testified that the two of them had a good relationship.)  Febus points out that Collazo testified that he received information from a municipal emergency services director that Febus had not done his job on one occasion; however, Collazo was unable to provide the plaintiffs with a copy of the municipal director's report.  Plaintiffs suggest that Collazo is unable to provide the report because it does not exist.

Febus testified that Collazo never wanted him in the office.  He also testified that although he was the Deputy Director, Collazo did not allow him to supervise anyone while Collazo was in the office.  He also testified that Collazo allowed Zulma Ortiz ("Ortiz"), an Orocovis Zone employee who Febus identifies as a staunch NPP supporter, to disobey him and act as she pleased when Collazo was out of the office.  Specifically, Febus stated that Ortiz told him that she would not follow instructions from a PDP deputy director.

Abel Latorre-Quiles ("Latorre"), a fellow AEMEAD employee in the Orocovis Zone, testified that Collazo told him that he was upset because he had not been permitted to evaluate Febus under the prior administration.  Latorre also testified that Collazo had never mentioned that Febus did his job poorly and that Latorre felt surprised when he learned that Febus had been fired.  Another Orocovis Zone employee, Osvaldo Torres-Rivas ("Torres"), testified that he too was surprised to learn that Febus had been fired, and he added that he believed that Febus performed all of his duties in a satisfactory fashion.

**E.  Political Affiliation**

Cumba testified that she and Collazo are both PNP members and that they have known each other for a long time.  Febus testified that Collazo harbors a lot of animus towards the PDP.  He also testified that the atmosphere at the office was politically

Civil No. 09-1365 (FAB)                                                  8

"hot," although Torres testified that he did not note any political tension and both Collazo and Martinez testified that political matters are not discussed in the office.  Torres testified that Collazo knows the political affiliation of everyone in the office.

Febus has never worked in an official capacity in any political campaign, but he was a ward president for the PDP and he has participated as a team member in support of a political campaign.  His former co-workers Martinez, Torres, and Latorre all testified that they knew Febus's political affiliation.  Neither Torres nor Latorre knew Febus to be a PDP leader, however, nor to be someone involved in political campaigns, although Latorre stated that his friend, PDP Senator Eder Ortiz, spent time with Febus at a political activity.

Although no one has been named to the deputy director position formerly held by Febus in the Orocovis Zone, both Febus and Latorre testified that Zulma Ortiz has taken on the duties of the deputy director position.  Ortiz is a member of the NPP party.

**II. Discussion**

    **A.   Motion for Summary Judgment Standard**

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  The Rule states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

Civil No. 09-1365 (FAB)                                                  9

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED.R.CIV.P. 56(c); see also Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion for summary judgment.  Santiago-Ramos, 217 F.3d at 52.  For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute.  See Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine."  FED.R.CIV.P. 56(c); Anderson, 477 U.S. at 248. "Material" means that a contested fact has the potential to change the outcome of the suit under governing law.  See Anderson, 477 U.S. at 248.  The issue is "genuine" when a reasonable jury could return a verdict for the nonmoving party based on the evidence.

Civil No. 09-1365 (FAB) 10

Id. It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. Id. at 251. It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).

In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

**B.   Political Discrimination**[4]

The First Amendment right to freedom of speech and association provide non-policymaking public employees with protection from adverse employment decisions based on their

---

[4] It is well-settled that in order for a claim to be cognizable under section 1983, a plaintiff must plead and prove three elements: (1) that the defendants acted under color of state law; (2) that plaintiffs were deprived of federally protected rights, privileges or immunities; and (3) that the defendants' alleged conduct was causally connected to the plaintiff's deprivation. Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 558 (1st Cir. 1989). At summary judgment, the defendants only challenge whether Febus has adduced evidence supportive of the second element. Therefore, the Court shall not address the first or third elements of a section 1983 claim.

Civil No. 09-1365 (FAB)                                                    11
_____

political affiliation. Padilla-Garcia v. Guillermo Rodriguez, 212 F.3d 69, 74 (1st Cir. 2000); see also Rutan v. Republican Party, 497 U.S. 62, 75 (1990); Branti v. Finkel, 445 U.S. 507, 516 (1980); Elrod v. Burns, 427 U.S. 347, 354 (1976). The Mount Healthy two-part burden shifting framework is used to evaluate claims of political discrimination. Padilla-Garcia, 212 F.3d at 74; c.f., Mount Healthy City Sch. Dist. Bd. Of Educ. v. Doyle, 429 U.S. 274, 287 (1977) (applying the two-part burden shifting analysis to a free speech claim). A plaintiff alleging political discrimination bears the threshold burden of producing sufficient evidence, whether direct or circumstantial, that he or she engaged in constitutionally protected conduct and that political affiliation was a substantial or motivating factor behind the challenged employment action. Gonzalez-Blasini v. Family Dept., 377 F.3d 81, 85 (1st Cir. 2004); Rodriguez-Rios v. Cordero, 138 F.3d 22, 24 (1st Cir. 1998). "The plaintiff must point to evidence on the record which, if credited, would permit a rational fact-finder to conclude that the challenged personnel action occurred and stemmed from a politically based discriminatory animus." Gonzalez-Blasini, 377 F.3d at 85 (quoting LaRou v. Ridlon, 98 F.3d 659, 661 (1st Cir. 1996) (quoting in turn Rivera-Cotto v. Rivera, 38 F.3d 611, 614 (1st Cir. 1994))).

To establish a *prima facie* case, the plaintiff must show that (1) the plaintiff and the defendant belong to opposing

Civil No. 09-1365 (FAB)                                              12

political affiliations; (2) the defendant has knowledge of the plaintiff's affiliation; (3) a challenged employment action occurred; and (4) political affiliation was a substantial or motivating factor behind the challenged employment action. Martin-Velez v. Rey-Hernandez, 506 F.3d 32, 39 (1st Cir. 2007); Peguero-Moronta v. Santiago, 464 F.3d 29, 48 (1st Cir. 2006).  The burden then shifts to the defendant, who must articulate a nondiscriminatory basis for the adverse employment action and establish by a preponderance of the evidence that he would have taken the same employment action regardless of the plaintiff's political affiliation. Padilla-Garcia, 212 F.3d at 74; Rodriguez-Rios, 138 F.3d at 24.  The shifting burden, known as the Mt. Healthy defense, "ensures that a plaintiff-employee who would have been dismissed in any event on legitimate grounds is not placed in a better position merely by virtue of the exercise of a constitutional right irrelevant to the adverse employment action." Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993) (citations omitted).  The evidence by which the plaintiff established a *prima facie* case may suffice for a fact-finder to infer that the defendant's proffered nondiscriminatory ground for the adverse employment action is pretextual, and "check" summary judgment. Padilla-Garcia, 212 F.3d at 78.

     Evidence of a highly-charged political environment coupled with the parties' competing political persuasions may be

sufficient to show discriminatory animus, especially where a plaintiff was a conspicuous target for political discrimination. Rodriguez-Rios, 138 F.3d at 24; see also Padilla-Garcia, 212 F.3d at 75-76 (upholding a denial of summary judgment where evidence showed that defendants knew of plaintiff's party affiliation, plaintiff was a conspicuous party member and witnesses testified as to defendant's desire to humiliate plaintiff).  Evidence that a plaintiff held a trust position under a previous administration of opposing political affiliation, and that plaintiff is a well-known supporter of a different political party, however, may not suffice to show that a challenged employment action was premised upon political affiliation.  Gonzalez-Blasini, 377 F.3d at 85-86; see also Cosme-Rosado v. Serrano-Rodriguez, 360 F.3d 42, 48 (1st Cir. 2004) (upholding a grant of summary judgment where the mayor "voiced his intention to rid the town of NPP activists"). Additionally, mere temporal proximity between an adverse employment action and a change of administration is insufficient to establish discriminatory animus.  Acevedo-Diaz, 1 F.3d at 69.

    **C.  Analysis**

    At this stage of the proceedings, all parties have egg on their faces.  On the one hand, inferences may be drawn from the evidence adduced thus far that the former PDP administration ensured Febus, a PDP partisan, that he would receive satisfactory evaluations by arranging for a senior official (not his immediate

Civil No. 09-1365 (FAB)                                                    14

supervisor) in a trust position (who was also a PDP sympathizer) to evaluate him. This procedure was not consistent with an administrative order in effect at the time that Febus was under probationary review nor was it consistent with other AEMEAD employees' probationary review. On the other hand, inferences can be drawn against the current NPP administration and Collazo, an NPP member, given that Collazo re-evaluated Febus, rather than simply evaluating him anew for what was left of his probationary period, and because Cumba shut out Cantres, the director of human resources, from the evaluation and personnel review process. Putting all of this aside, the only question that need concern the Court at this juncture is whether drawing all reasonable inferences from the facts adduced at summary judgment, it must rule in favor of the defendants. Acutely aware that at this stage of proceedings it may not make credibility determinations, the Court denies defendants' motion for summary judgment because Febus's *prima facie* showing raises an inference of pretext that defeats defendants' Mount Healthy defense at this stage.

In moving for summary judgment, defendants focus upon their rationale for separating Febus from his employment, rather than attacking Febus's *prima facie* case. Predictably then, Febus has little trouble making his *prima facie* showing. First, there is no dispute between the parties that Collazo and Sauri are members of the NPP, while Febus is a member of the PDP. Second, Torres

testified that Collazo knows the political affiliation of everyone in the office (including Febus).  Third, there is also no dispute that AEMEAD terminated Febus from his employment after Collazo determined that Febus did not perform in a satisfactory fashion during his probationary period.  (Strangely enough, however, Febus continues to receive a salary from AEMEAD.)  The only *prima facie* factor that the defendants actively contest is whether political affiliation was a substantial or motivating factor behind the challenged employment action.  The evidence relevant to this element, however, is also relevant to defendants' proffered non-discriminatory rationale for terminating Febus's employment.

To begin, the parties present conflicting stories as to how Febus even appeared on the proverbial radar screen of the administration at AEMEAD.  The defendants rely upon Cumba's testimony that she saw what appeared to be irregularities in Febus's paperwork after it was presented to her by Cantres.  This testimony supports defendants' legitimate rationale for terminating Febus, namely that his prior reviews were (possibly intentionally) improperly done and that once the new administration at AEMEAD became aware of this, Febus received a proper evaluation (by his immediate supervisor) and he was found to have performed in a less than satisfactory fashion.  The plaintiffs in turn focus on testimony from Collazo that he approached Cumba to discuss Febus.  This testimony supports plaintiffs' theory that Collazo harbored

animus towards Febus in particular because of his political affiliation, and towards the PDP in general, a point to which Febus testified.  At the time that Collazo approached Cumba, he knew that (based upon instructions from the prior (PDP) administration) he was not responsible for evaluating Febus.  Nonetheless, he approached Cumba, the head of administration, rather than Cantres, the head of human resources, to discuss Febus's evaluations and probationary status.  Cantres is a PDP member while Cumba is a member of the PNP and someone who Collazo has known for a long time.  Furthermore, at about this time Sauri changed the organizational structure of AEMEAD to place Human Resources under Administration.  Cumba then excluded Cantres from further personnel related decisions and actions regarding Febus.

In a single meeting, Collazo discussed his review of Febus with him and told him that he found his performance to be unsatisfactory.  Instead of reviewing Febus for the month of February (or from December 16, 2008, when Sotomayor was no longer in a supervisory position) essentially the period of time left in Febus's probationary period for which Febus had not yet received a review, Collazo re-evaluated Febus for his entire probationary period including the three periods during which Sotomayor had already evaluated Febus.  Collazo made no use of Sotomayor's evaluations, and he reached the exact opposite conclusion to that reached by Sotomayor.  The fact that Febus had first been

Civil No. 09-1365 (FAB)                                                  17

evaluated, not once but three times by Sotomayor and that his performance had been found to be satisfactory, suggests that Collazo's second evaluations done in one fell swoop are a fabricated excuse to get rid of Febus. This inference is reinforced by the testimony of Cantres, who testified that the evaluations done by Sotomayor and authorized by the prior administration were done in compliance with applicable rules. Crediting this statement as plausible at this stage of the proceedings, Collazo's rejection of the prior evaluations provides an additional inference that he was biased against Febus.

       To explain how Febus's performance was unsatisfactory, Collazo mentioned that Febus did not turn in weekly reports, that he did not attend a speaking event at a school that Febus directed him to attend, and that a municipal director of emergency relief filed a report in which he complained to Collazo regarding Febus. Febus in turn disputes that weekly reports were required or requested by Collazo. Febus also notes that Collazo has been unable to provide the report from the municipal emergency services director in discovery, and suggests that no such report actually exists. This leaves Febus's failure to attend a speaking engagement at a school as perhaps the sole uncontested grounds upon which Collazo based several negative evaluations. A failure to attend one speaking engagement may be grounds for one negative evaluation but not for three. At any rate, Collazo never provided

Civil No. 09-1365 (FAB)                                                  18

Febus with any written reprimands nor is there any document in the record that provides contemporaneous corroboration for any of Febus's alleged shortcomings.  The record of unsatisfactory performance by Febus begins and ends with the retroactive evaluations done all at once by Collazo.  The lack of any kind of additional record supportive of Collazo's contention that Febus performed in an unsatisfactory manner provides an additional basis from which to infer that Collazo's sudden negative evaluation of Febus was pretext for a discriminatory motive.  Also of some, though limited, relevance is testimony from fellow coworkers (who are not supervisors) from the Orocovis Zone who said they thought that Febus had performed well at the office, and who were surprised by his termination.  This testimony also allows for the inference that Collazo's negative evaluation was motivated by discriminatory animus, rather than by a legitimate review of Febus's work.

        Against this backdrop of evidence suggestive of a discriminatory motive, the defendants press their <u>Mount Healthy</u> defense. The defendants present a non-traditional argument; rather than emphasizing deficiencies in Febus's performance that justify his termination from employment (regardless of his political affiliation), they focus on irregularities concerning Sotomayor's three evaluations of Febus.  The evidence presented by the defendant might very well undermine the credibility of the testimony that Febus elicits in his favor, but it does not compel

the conclusion that Febus would have been terminated from his employment regardless of the presence of a politically discriminatory animus on the part of Collazo. For example, the existence of Administrative Order 93-002, the fact that Sotomayor did not evaluate any other AEMEAD employees in any zone as Director of Operations, and the fact that a deputy director situated similarly to Febus in another zone was reviewed by his immediate supervisor, all might undermine testimony from Cantres, Sotomayor and Febus that Sotomayor's evaluations were appropriately done. This involves weighing the credibility of different witnesses, however, a step the court will not take now; even if it did, defendants do not show by a preponderance of the evidence that they would have taken the same action regardless of Febus's political affiliation. They would only undermine the legitimacy of the earlier evaluations by Sotomayor. Therefore, Febus's *prima facie* showing that Collazo discriminated against him based upon his political affiliation checks summary judgment. See Padilla-Garcia, 212 F.3d at 78.

### III. Conclusion

For the reasons stated above, the Court **DENIES** defendants' motion for summary judgment.[5]

---

[5] The only defense raised by defendants in relation to the Commonwealth law claims is that those claims should be dismissed without prejudice presuming that the Court would dismiss all of the federal claims. Because the Court has not dismissed the political discrimination claim against Collazo in his individual capacity, or

Civil No. 09-1365 (FAB) 20

**IT IS SO ORDERED.**

San Juan, Puerto Rico, September 3, 2009.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE

---

against Sauri in his official capacity, the plaintiffs' Commonwealth claims remain against those defendants.